IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2016

**SAMUEL W. HIRSCH v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hawkins County**
**No. 15CR110        John F. Dugger, Jr., Judge**
_____

**No. E2015-02127-CCA-R3-PC – Filed July 19, 2016**
_____

Samuel W. Hirsh ("the Petitioner") entered a best interest plea to first degree felony murder and was sentenced to life without the possibility of parole. He then filed a timely pro se Petition for Post-Conviction Relief alleging numerous grounds. Following a hearing, the post-conviction court denied relief and dismissed the petition. On appeal the Petitioner claims that (1) counsel[1] was ineffective for failing to file a motion to suppress the Petitioner's statements and (2) "[the] conviction was based upon a coerced [p]lea [a]greement predicated upon an innate fear of receiving the [d]eath [p]enalty." Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Nicholas Spring Davenport, V, Morristown, Tennessee, for the appellant, Samuel W. Hirsch.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Dan Armstrong, District Attorney General; and Cecil C. Mills, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Because the State sought the death penalty, the Petitioner was represented by two attorneys. We will refer to them collectively as "counsel" in this opinion. Lead counsel will be referred to as "lead counsel."

# OPINION

## I. Factual and Procedural Background

### *Plea Colloquy*

The Hawkins County Grand Jury indicted the Petitioner with one count each of first degree felony murder, aggravated burglary, aggravated robbery, and theft of property valued at $1,000 or more but less than $10,000. Prior to trial, the State filed notice of its intent to seek the death penalty. The Petitioner entered a best interest plea to first degree felony murder. Pursuant to the plea agreement, the Petitioner was sentenced to life without the possibility of parole, and the State entered a *nolle prosequi* for the remaining counts in the indictment.

At the plea colloquy, the Petitioner stated that he was twenty-three years old, had completed school through the eighth grade, and could read and write without difficulty. The Petitioner also stated that he understood the charges against him and the elements of first degree felony murder. The Petitioner confirmed that he understood that, if his case had gone to trial, the possibility of a death sentence would be considered in a bifurcated proceeding. The Petitioner stated that his attorneys had explained the elements of first degree felony murder to him, had explained the lesser included offenses of first degree felony murder, had gone over the plea agreement, and had explained the constitutional rights that the Petitioner would waive by entering a best interest plea. The Petitioner said he "read [the waiver of rights form] fine" and that he understood what it said. The Petitioner agreed that, had the case gone to trial, he "probably could have been found guilty." He confirmed that he was entering his plea freely and voluntarily and that he thought the plea was a "fair disposition." The Petitioner affirmed he was satisfied with both of his attorneys and that he was comfortable with the advice they gave him. The Petitioner confirmed that counsel had done everything the Petitioner wanted them to do.

During the plea colloquy, the State read the following factual basis for the plea into the record:

> . . . On or about March the 16th of 2013, [co-defendant] Mr. Austin Price and [the Petitioner] went to the home of Roger Hawkins. They knocked on his door which was an apartment. They burst in, if you will, Your Honor, ended up stabbing him multiple times, put a couch on top of him[,] and removed guns and currency, U.S. currency from the residence. The case was investigated by Rogersville Police Department and the Tennessee Bureau of Investigation as well as the DA's office investigator and [the Petitioner] was developed as a suspect. He was subsequently interviewed and I will read his statement to you, You Honor.

In the Petitioner's statement, which was read into the record, he initially denied any knowledge about the victim's death and claimed that he and Mr. Price acquired "the money" from a wallet that he found near a Walmart. However, the Petitioner then admitted that "where [he and Mr. Price] found the money was a lie." He said he and Mr. Price covered their faces with pieces of cloth and went to the victim's apartment with the intent to rob him. When the victim opened the door, Mr. Price "rushed in and started hitting [the victim] with a hammer." The victim fought back, so the Petitioner "choked [him] until he became calm." During the struggle, the victim pulled the cloth off of Mr. Price's face. Mr. Price said the victim "knew too much," so he picked up a knife, and stabbed the victim "over and over." Mr. Price took the victim's wallet and guns, and he and the Petitioner went back to the apartment where Ronnie,[2] a relative of Mr. Price, lived. There, Mr. Price cleaned the hammer and then went downstairs while wearing the Petitioner's boots, tracking blood outside Ronnie's apartment. The Petitioner and Mr. Price washed their clothes and hid the guns in a nearby carwash. The Petitioner said he hid another shotgun "under a bush next to the apartment."[3] They then went to Walmart to buy new shoes, and the Petitioner threw away his boots in a dumpster outside of the store. The Petitioner and Mr. Price then returned to Ronnie's apartment. Mr. Price paid Ronnie eighty dollars and told Ronnie that he had found a wallet with money in it, to which Ronnie replied, "[Y]ou lucky dog." The Petitioner said he tried to convince Mr. Price to call 911, but Mr. Price "went to sleep after he killed [the victim.]" The Petitioner admitted that he "washed the concrete off this morning where the blood was." The statement was signed by the Petitioner.

The Petitioner agreed that the statement was "a fair statement of what the State's proof would be against [him.]" He also said that he understood everything included in the statement. The trial court accepted the Petitioner's guilty plea and sentenced him to life imprisonment without the possibility of parole.

*Post-Conviction Proceedings*

The Petitioner filed a timely pro se Petition for Post-Conviction Relief ("the Petition") alleging that the Petitioner's conviction was based on: the use of a coerced confession, a violation of the Petitioner's privilege against self-incrimination, the failure of the state to disclose evidence favorable to the Petitioner, a statement given while he was intoxicated, and "a coerced [p]lea [a]greement predicated upon an innate fear of receiving the [d]eath [p]enalty." Additionally, the Petitioner claimed he received

---

[2] Ronnie's last name is not included in the record on appeal. Therefore, we must refer to him by his first name in this opinion. We intend no disrespect.

[3] It is not clear from the record whether the shotgun was one of the guns taken from the victim's home.

- 3 -

ineffective assistance of counsel and that there was newly discovered evidence. Post-conviction counsel was appointed, but no amended petition was filed.

At the post-conviction hearing, the Petitioner testified that his "[c]oerced confession" was used as evidence against him. The Petitioner stated that, at the time he was arrested, he was in possession of "a few different prescription drugs" that were not prescribed to him, namely "Opana, Valiums, [and] a few Lortabs." The Petitioner stated that he took all of the prescription drugs prior to being questioned by the police and that he was intoxicated during the police interview. The Petitioner recalled that he was taken to another location and placed in a room that looked like an office. There, the police took the Petitioner's personal belongings and shoes and left the Petitioner "to sit and stew by [himself]" while police spoke with his codefendant. Eventually, agents from the Tennessee Bureau of Investigation ("TBI") questioned the Petitioner for "maybe an hour or so, give or take." The Petitioner said he felt "[i]ntoxicated, scared, [and] nervous" during the interview. The Petitioner confirmed that the TBI agents informed him of his Miranda rights, and he said he did not have questions about those rights. The Petitioner admitted that he signed the Miranda rights waiver form, but he explained, ". . . I signed it in the mind state of cooperating, not to—not for it to be used against me." The Petitioner said he thought that cooperating with police would "help [him] out in the long run." He noted that the TBI agent informed him that his "codefendant is over there singing . . . and putting it all on [the Petitioner]."

The Petitioner said he initially tried to act like he did not know anything about the crime. However, one of the TBI agents left the room and went to talk to the Petitioner's codefendant a second time while another agent stayed in the room with the Petitioner. The agent that stayed "starting talking to [the Petitioner] and saying things that only [the Petitioner's] codefendant and [the victim] would know." At that point, the Petitioner realized that his codefendant was placing all the responsibility for the offense on him, and he decided to cooperate.

As the Petitioner gave his statement, TBI agents wrote what the Petitioner said, but the Petitioner claimed that "one main phrase" was misinterpreted during this process. The Petitioner said he never tried to strangle the victim. Instead, in an attempt to "defuse the situation from escalating any more that it did," he merely tried to separate the victim and his codefendant while they were struggling. The Petitioner denied saying he strangled the victim. The Petitioner said he read the statement for the first time when counsel gave him a copy of the discovery in the case.

The Petitioner said he "was convinced that maybe telling [his] side of the story or at least helping may help [him]." He admitted that he did not ask for an attorney or invoke his right to remain silent. The Petitioner explained that he had been interrogated for minor offenses before, but this was his first time dealing with serious criminal

charges. The Petitioner recalled that the State read a portion of his statement into the record during the plea colloquy. He affirmed that his statement was "not what [he] wanted it to be," and he maintained that he gave the statement because he was trying to cooperate.

The Petitioner stated that he met with his counsel "[f]ive to ten times" in the two years he was incarcerated in the county jail and that each meeting lasted "maybe an hour at this [sic] most." The Petitioner stated that his attorneys "couldn't get past the fact that the [S]tate had offered [the Petitioner] a plea of life without [the possibility of parole]." The Petitioner surmised that, because he had confessed to the offense, counsel did not feel confident about going to trial. The Petitioner acknowledged that counsel reviewed and discussed the discovery with the Petitioner. The Petitioner said he wrote letters to counsel asking them "how they felt [the case] would stand in front of a jury" and whether there was "any chance that they would get the death penalty off the table." The Petitioner stated that counsel "always replied as though the State of Tennessee just wants to execute. They never seem[ed] to make me feel confident about anything in my favor and the going to trial." The Petitioner said counsel's "negative viewpoint" of the case influenced his decision to enter a best interest plea.

The Petitioner said he told counsel that he was intoxicated at the time he gave his statement and asked them if they could suppress the statement. Counsel told him that "[i]t was near[ly] impossible or it never happens, more or less just shrugged it off." The Petitioner said he would have felt more confident about going to trial if the statement had been suppressed.

The Petitioner said he spoke to counsel about his fear of the death penalty. The Petitioner said that the possibility of receiving the death penalty influenced "100 percent" of his decision to enter a plea. The Petitioner recalled that he provided names of people who would serve as mitigation character witnesses, but those witnesses were never questioned. The Petitioner said that he "[was not] aware of anything that would have been in [his] favor" had he decided to proceed to trial. The Petitioner said he thought that counsel should have done more investigation in order to present mitigating evidence to the jury and filed a motion to suppress the Petitioner's statement. The Petitioner did not recall counsel's interviewing any of the State's witnesses. In short, the Petitioner felt that his confession was the primary evidence against him. He also agreed that counsel's failure to suppress that statement or gather mitigating evidence on his behalf lead him to enter the plea.

On cross-examination, the Petitioner said he understood the questions the trial court asked during the plea colloquy and that he answered them honestly. He also agreed that he viewed the death penalty as the worst possible outcome for his case. The Petitioner stated that he accepted the plea agreement in order to avoid the death penalty.

However, he said he told the trial court that he was satisfied with counsel's representation because he felt that he had no other options. The Petitioner admitted that he did not question counsel's representation until after the plea was entered and he was no longer facing the threat of the death penalty.

The Petitioner admitted that he had the presence of mind during his interrogation to try to act as if he had no knowledge of the crime and that he changed his mind when he learned that his codefendant was providing details about the offense. The Petitioner also confirmed that he gave his statement willingly. The Petitioner claimed that his attorneys never discussed with him the witnesses who would testify against the Petitioner. On redirect examination, the Petitioner said he would not have entered a plea if his statement had been suppressed.

Concerning the State's failure to disclose exculpatory evidence, the Petitioner stated that there were "a few little letters between me and my co-defendant" written while they were incarcerated. The Petitioner testified that he turned those letters over to the detectives. Those letters were not presented at the post-conviction hearing and the Petitioner offered no testimony as to their contents or how they were exculpatory. The Petitioner presented no proof concerning the existence of any newly discovered evidence.

Lead counsel testified that he had been practicing law since 1988. Lead counsel testified that, because this was a capital case, he obtained the services of a fact investigator, a mitigation investigator, and a mental health professional to prepare the Petitioner's defense. After the State filed its notice of intent to seek the death penalty, another attorney was appointed as co-counsel. Lead counsel noted that there was "a lot of mitigation evidence" in this case, and he stated that he discussed that evidence with the Petitioner. Lead counsel also recalled that every meeting with the Petitioner lasted at least "an hour and a half to two hours." Lead counsel said he filed motions on the Petitioner's behalf, but he did not file a motion to suppress the Petitioner's statement. Lead counsel stated that he would have filed a motion to suppress the statement, but the Petitioner entered his plea before the motion was filed. Regardless, lead counsel stated that the Petitioner had signed a Miranda waiver and that lead counsel was aware of what witnesses would say during the hearing, and in his professional opinion, it was unlikely that the motion would have been granted.

Lead counsel also recalled the Petitioner's codefendant had made contradictory statements, the victim's blood was found on the Petitioner's boots, and there was a trail of blood from the victim's apartment to the apartment where the Petitioner and his codefendant were staying that evening. Lead counsel noted that this was a "challenging case" and stated that, in his opinion, the Petitioner was "more likely than not" to be convicted and receive the death penalty.

The post-conviction court filed a detailed "Memorandum Opinion and Order" stating "the findings of fact and conclusions of law with regard to each ground" raised in the petition as required by Tennessee Code Annotated section 40-30-111(b). Regarding the Petitioner's statement, the post-conviction court found that the Petitioner had "failed to prove by clear and convincing evidence that his conviction was based on a coerced confession and that he was intoxicated while the TBI Agent wrote the statement." The post-conviction court stated that the evidence, including the Petitioner's own admission, showed that the Petitioner made a conscious decision to cooperate with law enforcement and provide a signed statement. The post-conviction court found that Petitioner presented no evidence "concerning the content of the letters and how they could be favorable to him." Additionally, the post-conviction court found that the "Petitioner did not articulate what, if any[,] newly discovered evidence exist[ed]." As to the Petitioner's claim of ineffective assistance of counsel, the post-conviction court found that counsel was "faced with an extremely difficult case." The post-conviction court found that counsel investigated the case, filed the appropriate motions, and explained why the motion to suppress the Petitioner's statement was not filed. The post-conviction court found that the Petitioner had received effective assistance of counsel. Additionally, the post-conviction court found that the Petitioner was not credible and that his plea was knowingly and voluntarily entered. The post-conviction court dismissed the petition and this timely appeal followed.

## II. Analysis

### Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

On appeal, the Petitioner argues that he received ineffective assistance of counsel when counsel failed to file a motion to suppress the Petitioner's statement. The Petitioner asserts that counsel's performance was deficient because he asked them to file a motion to suppress and that he was prejudiced by that deficiency because the Petitioner would not have entered a plea if his statement had been suppressed.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in

the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. Hill v. Lockhart, 474 U.S.52, 58 (1985); Don Allen Rodgers v. State, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Crim. App. Apr. 26, 2012). First, the petitioner must show that his counsel's performance fell below the objective standards of reasonableness and professional norms. See Hill, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." Id. at 59.

This court has previously addressed the evidence necessary at a post-conviction hearing in order to demonstrate that counsel's failure to file a motion to suppress prejudiced the petitioner:

> It is well settled that when a [p]etitioner in post-conviction proceedings asserts that counsel rendered ineffective assistance of counsel by failing to call certain witnesses to testify, or by failing to interview certain witnesses, these witnesses should be called to testify at the post-conviction hearing; otherwise, [p]etitioner asks the [c]ourt to grant relief based upon mere speculation. Black v. State, 794 S.W.2d 752, 757 (Tenn. 1990). The same standard applies when a [p]etitioner argues that counsel was constitutionally ineffective by failing to file pre-trial motions to suppress evidence. In order to show prejudice, [a] [p]etitioner must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested. Vaughn v. State, 202 S.W.3d 106, 120 (Tenn. 2006) (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064-65). In essence, the petitioner should incorporate a motion to suppress within the proof presented at the post-conviction hearing.

Terrance Cecil v. State, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011), no perm. app. filed.

In this case the Petitioner failed to demonstrate that a motion to suppress his statement would have been successful had it been filed. The only evidence in the record indicating that the Petitioner's confession was "coerced" is the Petitioner's own claim that he was intoxicated at the time of his interrogation and that he thought his codefendant was placing the blame on him. Further, the Petitioner admitted that he was

- 9 -

informed of his <u>Miranda</u> rights and that he voluntarily gave his statement in an attempt to cooperate with law enforcement. Based on the record before us, we are unable to determine that a motion to suppress the Petitioner's statement would have been granted. The Petitioner has failed to show that he was prejudiced by any alleged deficiency, and the post-conviction court correctly denied relief on this issue.

*Voluntary and Knowing Plea*

Second, the Petitioner argues that he "did not enter a voluntary plea with sufficient knowledge of the strength of his case." The Petitioner claims that the primary evidence against him was his "coerced confession" and that, because that statement was not suppressed, he "had to make his decision [to enter a plea] without knowing the strength of his case, while considering the death penalty." Additionally, the Petitioner asserts that counsel's focus on the possibility that the Petitioner would receive the death sentence influenced his decision to enter a plea. The State argues that the Petitioner's statements during the plea colloquy indicate that he entered his plea knowingly and voluntarily.

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969), and the state standard as announced in <u>State v. Mackey</u>, 553 S.W.2d 337 (Tenn. 1977), <u>superseded on other grounds by</u> Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). <u>Don Allen Rodgers</u>, 2012 WL 1478764, at *5. Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." <u>Boykin</u>, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e. that he has been made aware of the significant consequences of such a plea . . . ." <u>Mackey</u>, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . .'" <u>Blankenship v. State</u>, 858 S.W.2d 897, 904 (Tenn. 1993) (quoting <u>Boykin</u>, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." <u>Boykin</u>, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty,

- 10 -

including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904; Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. Boykin, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conclusory allegations unsupported by specifics." Id. at 74.

In this case, the Petitioner stated during the plea colloquy that he could read and write without difficulty, that he understood the charges against him, and that he understood the terms of his best interest plea. He further stated that he had reviewed the plea agreement with his attorneys and understood what constitutional rights he was waiving by entering a plea. The Petitioner said he was satisfied with counsel's representation, that they had done everything he asked, and that he thought the plea was a "fair disposition." Additionally, the Petitioner agreed that the State's recitation of the facts was "a fair statement of what the State's proof would be against [him.]" He also said that he understood his own statement.

The Petitioner claims that counsel's failure to file a motion to suppress his statement prevented the Petitioner from understanding the strength of his case. However, as noted above, the Petitioner has failed to show that, had counsel filed a motion to suppress, they would have been successful. Further, as lead counsel testified, there was other evidence apart from the Petitioner's statement, including the Petitioner's discarded boots and a blood trail from the victim's apartment to the apartment where the Petitioner and his codefendant were staying.

Second, the Petitioner claims that the threat of the death penalty influenced his decision to enter a plea. However, "[t]he entry of a guilty plea to avoid the death sentence or risk greater punishment does not, standing alone, make the plea involuntary." Parham v. State, 885 S.W.3d 375, 381 (Tenn. Crim. App. 1994). The Petitioner has not identified any other factor that would have rendered his plea involuntary or unknowing. The Petitioner clearly wanted to avoid the possibility of the death penalty and understood that the plea agreement allowed him to do so. Further, as noted above, the trial court conducted a thorough plea colloquy, and the Petitioner continually affirmed that he

understood the plea agreement. The Petitioner has failed to show that his plea was entered involuntarily or unknowingly, and he is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE